Filed 1/29/16  In re E.S. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.S. et al., Persons Coming Under the Juvenile Court Law. | |
| | D068186 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ2955A, B) |
| v. | |
| S.S., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County,

Gary M. Bubis, Judge.  Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

William H. Hook, under appointment by the Court of Appeal, for Minors.

# I.

## INTRODUCTION

S.S. (mother) appeals from a judgment terminating her parental rights to her two children, E.S. and V.S. On appeal, mother claims that, at the disposition hearing, the trial court failed to orally advise her that in order to challenge an order entered at that hearing denying reunification services, she would have to file a writ petition.[1] Mother argues that this failure constitutes good cause for permitting her to raise claims pertaining to the order denying reunification services in this appeal from the judgment terminating her parental rights.

Mother further claims that the order denying reunification services should be reversed because: the order is not supported by substantial evidence; the trial court failed to obtain a knowing and intelligent waiver from mother of her purported right to receive services; and trial counsel provided ineffective assistance in failing to contest the denial of services. In the alternative, mother claims that the trial court erred in finding that the beneficial parent-child relationship exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i))[2] did not apply to preclude the termination of her parental rights.

---

[1] The trial court denied the mother reunification services pursuant to Welfare and Institutions Code section 361.5, subdivisions (b)(10) and (b)(11). Under these provisions, a trial court may deny reunification services to a parent if the court has previously terminated reunification services or parental rights with respect to a sibling of the child and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ." (Welf. & Inst. Code, § 361.5, subd. (b)(10), (11).)

[2] Unless otherwise specified, all subsequent statutory references are to the Welfare and Institutions Code.

The Agency concedes, and we agree, that the trial court's failure to orally advise mother of the necessity of filing a writ petition if she wanted to challenge the court's order denying reunification services constitutes good cause for permitting her to raise her claims regarding denial of reunification services in this appeal. However, we affirm the order denying reunification services and the judgment terminating parental rights.[3]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The termination of the parents' parental rights to E.S. and V.S.'s three siblings*

J.S. (father) and mother are the parents of E.S. and V.S., born in 2005 and 2006 respectively, as well as three children born in 1994, 1998, and 2001 (the siblings). In February 2004, a police officer discovered the siblings in a car in which they had been living with their parents. The siblings were filthy and smelled of urine. The car contained empty beer cans and a marijuana joint was in plain view. Nine-year-old A.S. was ill and had not received medical treatment. The parents were drug tested, and the results came back positive for methamphetamine. The Imperial County Department of Social Services (Department) filed a dependency petition alleging that the parents were unable to provide regular care for the children due to their substance abuse.

The trial court removed the children from the parents' custody and offered the parents reunification services consisting of parenting classes, individual counseling,

_____

[3]     In a separate order filed today, we summarily deny mother's petition for habeas corpus, in which mother contended that trial counsel provided ineffective assistance at various stages of the proceedings in the trial court.

outpatient drug treatment, random drug testing, and anger management courses. The parents did not participate in any of these services and failed to reunify with the siblings. The trial court terminated father and mother's parental rights to the siblings in April 2005. The maternal grandparents adopted the siblings in November 2006.

B.    *E.S. and V.S.'s first dependency case*

In June 2006, after V.S. tested positive for methamphetamines at birth, the Department[4] conducted a child abuse investigation related to E.S. and V.S. Mother admitted smoking methamphetamine. Father admitted that he had a problem with alcohol and also stated that he would " 'use [methamphetamine] with [his] wife every now and then.' " The parents also admitted that they were not able to provide E.S. and V.S. with food and other basic necessities. The parents informed social workers that they were homeless and that none of their relatives would allow the parents to stay with them. The paternal grandmother reported that the parents were no longer welcome in her home due to father's violent behavior toward everyone when he drank.

During the summer of 2006, the Department took custody of E.S. and V.S., placed them with their maternal grandparents, and initiated dependency proceedings with respect to both children. At a status review hearing in February 2008, the Department recommended that the children be returned to the parents and that the parents be

---

4      Although it is not entirely clear from the record, it appears that the Department was the social service agency that investigated this allegation, since the Department filed a dependency petition pertaining to the allegation in July 2006.

provided family maintenance services.  The trial court followed the Department's recommendations and eventually terminated dependency jurisdiction in September 2008.

C.      *Events leading to the current dependency case*

On January 18, 2014, the Agency was notified that father had been arrested for driving under the influence (DUI) and that mother, E.S., and V.S. had been in the car that father was driving at the time of his arrest.  In addition, the Agency received reports in March 2014 that father was attending parenting classes while under the influence of either alcohol and/or drugs.  The reporting party also believed that father was caring for E.S. and V.S. at home while intoxicated.

An investigating social worker met with the parents on March 20.  Father admitted that he had been arrested for DUI on two different occasions in January 2014,[5] and that he had recently been stopped by police while walking with E.S. and V.S. and that police told him that it sounded as if he was slurring his words in response to their questions.  On March 26, the parents agreed to participate in a Voluntary Services Case with the Agency.  The services were designed to address father's alcohol abuse and to prevent father from caring for E.S. and V.S. after having consumed alcohol.  The parents were provided with referrals for counseling, drug testing, substance abuse meetings, and parent education services.

---

[5]      A criminal record check performed in October 2014 revealed that father was also arrested in April 2014 for DUI and driving with a suspended license.

Father was arrested on May 2 after testing positive for alcohol. While in custody, father spoke to an Agency social worker and denied that he had a problem with alcohol. After father was released from custody in June 2014, both parents remained evasive about father's whereabouts. Father also refused to submit to drug testing. On July 16, the Agency asked mother to submit to a drug test. Mother failed to submit to the testing, and the Agency considered this failure to be equivalent to a positive drug test.

The Agency learned in early September 2014 that father would drink alcohol to the point of passing out when taking care of E.S. and V.S. after school, while mother was at work. Father was intoxicated at both a school assembly and a meeting with Agency employees later that month. Father also continued to refuse to submit to drug testing, telling an Agency social worker, " '[T]his is a Voluntary case and not a Court case.' "

Meanwhile, mother had been attending weekly therapy as well as codependency meetings for several months. According to mother's therapist, mother realized that she had to stop allowing father to drink around the children. Father attended just two therapy sessions in 2014, and appeared to be under the influence of alcohol and/or drugs during a therapy session on October 3, 2014.[6]

D.    *The Agency files dependency petitions in this case*

On October 14, 2014, the Agency filed juvenile dependency petitions on behalf of then nine-year-old E.S. and eight-year-old V.S. The Agency alleged that there was a

---

[6]    The therapist reported that mother and V.S. were also at the October 3 therapy session. V.S. cried during the session upon seeing that his father was under the influence of alcohol and/or drugs.

substantial risk that the children would suffer serious physical harm due to father's excessive alcohol use, rendering him unable to care for the children, and mother's failure to protect the children from father's alcohol abuse.

E.    *The initial detention hearings*

At the first detention hearing on October 15, the trial court ordered the children detained in mother's custody on the condition that father move out of the family home.

On the day of the detention hearing, mother submitted to a drug test. On October 22, the Agency received notice that mother tested positive for methamphetamine. That same day, an Agency social worker interviewed mother, who admitted that she had used methamphetamine with father. Mother refused to say how often she had been using methamphetamine, but admitted to having driven the children to and from school on the day she tested positive for methamphetamine. According to the social worker, during the interview, mother "act[ed] paranoid," and repeatedly looked behind her as if someone was following her or watching her. The social worker felt unsafe and ended the interview.

The following day, the Agency filed amended dependency petitions and an application for a protective custody warrant on behalf of E.S. and V.S. In addition to the original allegations regarding father's alcohol abuse, the amended petitions contained new allegations regarding parents' methamphetamine use. The trial court issued a protective custody warrant that same day, and E.S. and V.S. were placed with the maternal grandparents, who had previously adopted E.S. and V.S.'s siblings.

7

F.     *Events leading up to the jurisdiction / disposition hearing*

The children informed Agency social workers that father remained in the home even after the trial court's October 15 order.  E.S. told a social worker that he had seen his parents use alcohol and drugs and that he did not feel safe at night.  V.S. reported seeing his father drink "a lot" of beer.  Both children wanted to live with their maternal grandparents.  The Agency also received reports that father continued to come to the children's school while intoxicated and that he was asked to leave a therapy session because he was intoxicated.

After the children were removed from the parents' custody, the parents were provided with separate, supervised visitation.  On October 22, E.S. urinated in his pants after he saw his father.  The children cried and refused additional visits with both parents.  E.S. and V.S. both told the maternal grandparents and the visitation monitor that they were not ready to see their parents, and they cried when it was time to go to the visits.  After the children refused numerous visits, a visitation center cancelled the parents' visitation time slot.

In November 2014, the children's therapist[7] informed the Agency that the children were progressing in therapy and that they were happier since moving in with the maternal grandparents.[8]

---

[7]     It is not clear from the record when the children began therapy.

[8]     An Agency report stated that the children were "much happier since moving with the *paternal* grandparents," but it is undisputed that the children were placed with the *maternal* grandparents.  (Italics added.)

In early December 2014, mother told her trial counsel that father was no longer living in the family home. On December 11, trial counsel provided this information to the Agency. That same day, an Agency social worker contacted father to verify his current address. Father reported that his address had not changed, and he referred to the address of the family home as "my house." Mother's therapist reported that father was still "in and out of the home" as of mid-December 2014.

On December 12, 2014, father arrived intoxicated to a meeting with the social worker and the substance abuse specialist at the courthouse. Also, as of December 18, 2014, mother had not provided an Agency social worker with the contact information of her substance abuse counselor, as the social worker had requested.

G.      *The trial court denies both parents reunification services at the jurisdiction / disposition hearing*

In its November 5, 2014 jurisdiction/disposition report, the Agency recommended that the parents be denied reunification services pursuant to section 361.5, subdivisions (b)(10) and (b)(11). In support of this recommendation, the Agency noted that the parents had previously failed to reunify and that their parental rights as to E.S. and V.S.'s siblings had been terminated. The Agency argued that the parents had not made a reasonable effort to treat the problems that led to removal of the siblings.

At the December 18, 2014 jurisdiction and disposition hearing, mother's counsel informed the trial court that she was "not contesting the recommendation at this time." Father maintained his trial set and the court conducted a contested jurisdiction and disposition hearing as to father.

9

At the conclusion of the hearing, the trial court determined that no reunification services would be provided to the parents pursuant to section 361.5, subdivisions (b)(10) and (b)(11) and referred the matter for a section 366.26 hearing, stating:

> "Pursuant to [section] 361.5, [subdivisions](b)(10) and (b)(11), no reunification services will be provided to either parent. The evidence speaks for itself in this case. Numerous efforts have been made over a long period of time. These poor kids are now eight and nine, they have had a pretty rough life. . . . The hearing will be held within 120 days of today's date, pursuant to [section] 366.26, at which time a permanent plan will be chosen."

The trial court did not specifically advise mother of the necessity of filing a writ petition if she wanted to challenge the trial court's order.[9]

H.     *The trial court's termination of parental rights to E.S. and V.S. at the section 366.26 hearing*

The Agency submitted a report for the section 366.26 hearing recommending termination of both parents' parental rights and a permanent plan of adoption for the children. The Agency assessed both children to be specifically adoptable by the maternal grandparents. E.S and V.S were doing well academically, physically, and emotionally in the grandparents' care and both children stated they wanted to be adopted by their grandparents.

The section 366.26 report noted that the mother was beginning to have some visitation with the children and described the children's emotional states with respect to their mother. After summarizing the evidence pertaining to these issues, the Agency

---

[9]     The court did state to mother's counsel, "Please advise your client of their writ rights."

stated, "The mother's visits appear to be appropriate; however the children's emotional reactions and verbal statements are evidence that their [*sic*] does not appear to be an attachment to the mother." In an addendum report, the Agency indicated that recent visits had generally gone well[10] and that mother was attentive and supportive to the children during visits. Nevertheless, the children continued to express fear that father was still a part of the mother's life due to her pattern and history with father. The report also indicated that E.S. and V.S. appeared to have little trust in their mother and therefore had no desire to visit her in her home to verify that the father was not living there. The Agency continued to recommend termination of parental rights and a permanent plan of adoption for the children.

The trial court held a contested section 366.26 hearing on May 18, 2015. At the conclusion of the hearing, the trial court found that the children were adoptable and that adoption was in their best interests. As discussed in part III.E., *post*, the court also found that the beneficial parent-child relation exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i) did not apply. The court terminated father and mother's parental rights to E.S. and V.S., declared adoption as the children's permanent plan, and designated the maternal grandparents as their prospective adoptive parents.

I.     *Mother's appeal*

Mother timely appeals from the judgment terminating her parental rights to E.S. and V.S.

---

10     However, E.S. continued to defecate or urinate in his pants during visits with the mother.

11

III.

DISCUSSION

A.   *The trial court's failure to orally advise mother at the disposition hearing of the necessity of filing a writ petition in order to challenge the court's order denying reunification services constitutes good cause for permitting mother to raise claims pertaining to the denial of services on appeal from the judgment terminating parental rights*

Mother claims that the trial court erred in failing to orally advise her at the disposition hearing of the necessity of filing a writ petition if she wanted to challenge the court's order denying reunification services.  Mother contends that such advisement is required pursuant to section 366.26, subdivision (l)(3)(A) and California Rules of Court, rule 5.590(b).[11]  Mother maintains that the error constitutes good cause to permit her to raise claims pertaining to the trial court's order denying reunification services in this

---

[11]   Section 366.26, subdivision (l)(3) provides in relevant part:

>"(3) The Judicial Council shall adopt rules of court, effective January 1, 1995, to ensure all of the following:
>
>"(A) A trial court, after issuance of an order directing a hearing pursuant to this section be held, shall advise all parties of the requirement of filing a petition for extraordinary writ review as set forth in this subdivision in order to preserve any right to appeal in these issues.  This notice shall be made orally to a party if the party is present at the time of the making of the order or by first-class mail by the clerk of the court to the last known address of a party not present at the time of the making of the order."

California Rules of Court, rule 5.590(b) provides, "When the court orders a hearing under Welfare and Institutions Code section 366.26, the court must advise all parties and, if present, the child's parent, guardian, or adult relative, that if the party wishes to preserve any right to review on appeal of the order setting the hearing under Welfare and Institutions Code section 366.26, the party is required to seek an

appeal, notwithstanding that section 366.26, subdivisions (l)(1) and (l)(2) ordinarily would preclude raising such a challenge in an appeal from a judgment terminating parental rights. The Agency concedes the error and "agrees that this court may reach the mother's claims . . . ." (Capitalization omitted.)

We accept the Agency's concessions and conclude that the trial court's error in failing to orally advise mother of the writ petition requirement constitutes good cause to permit mother to raise claims pertaining to the court's order denying reunification services in this appeal from the judgment terminating parental rights.[12]

B.      *By failing to contest the Agency's recommendation to deny reunification services in the trial court, mother forfeited her right to challenge on appeal the trial court's order denying services*

Mother contends that the trial court's order denying reunification services is not supported by substantial evidence. The Agency contends that mother forfeited this claim by failing to contest the Agency's recommendation to deny services at the disposition hearing. The Agency is correct.

In *In re Richard K.* (1994) 25 Cal.App.4th 580, 589 (*Richard K.*), the court concluded that a parent in a dependency proceeding who submitted on a social worker's

---

extraordinary writ by filing a *Notice of Intent to File Writ Petition and Request for Record (California Rules of Court, Rule 8.450)* (form JV-820) or other notice of intent to file a writ petition and request for record and a *Petition for Extraordinary Writ (California Rules of Court, Rules 8.452, 8.456)* (form JV-825) or other petition for extraordinary writ."

[12]      The trial court's request that counsel advise mother of her "writ rights," did not satisfy the *court's* mandatory duty to provide the advisement.

recommendation could not later challenge a trial court order that followed the recommendation. (*Id.* at pp. 589-590.) The court reasoned in part:

> "The mother's submittal on the recommendation dispels any challenge to and, in essence, endorses the court's issuance of the recommended findings and orders. [Fn. omitted.] [¶] In other words, the mother was not disputing that the court should adjudge her children dependents, order them removed from her custody and provide a reunification plan. If, as occurred in this case, the court in turn makes the recommended orders, the party who submits on the recommendation should not be heard to complain. . . . [I]n this case, by submitting on the recommendation without introducing any evidence or offering any argument, the parent waived her right to contest the juvenile court's disposition since it coincided with the social worker's recommendation." (*Ibid.*)

Numerous courts have adopted the *Richard K.* court's analysis. (See, e.g., *In re T.V.* (2013) 217 Cal.App.4th 126, 136 ["[W]hen a parent submits on a social worker's recommendation . . . he or she forfeit[s] the right to contest the juvenile court's decision if it coincides with that recommendation"]; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565 ["a parent waives his or her right to challenge a juvenile court's order when the parent submits the matter on the social worker's recommendation"].)

In this case, at the disposition hearing, after the court requested that counsel provide an opening statement, the following colloquy occurred:

> "[Mother's counsel]: Actually, your honor, I need to clarify something. Mother is withdrawing her trial set, she's not contesting the recommendation at this time.
>
> "The court: Okay.
>
> "[Mother's counsel]: It's not because she doesn't want to have services, but she is deferring to her children's feelings and wishes at this time."

14

Mother concedes that "trial counsel for mother told the court mother was not contesting the recommendation for no reunification services," and mother does not attempt to distinguish *Richard K.* or its progeny on appeal. Accordingly, we conclude that mother forfeited her right to contest the trial court's order denying her reunification services. (See *Richard K.*, *supra*, 25 Cal.App.4th at p. 589.)

C.   *The trial court was not required to conduct a colloquy with mother to determine whether she knowingly and intelligently elected not to contest the Agency's recommendation to deny reunification services*

Mother contends that before a trial court may deny services based on a parent's submission to an Agency's bypass recommendation,[13] the court must obtain the parent's knowing and intelligent waiver of the "right to reunification services."[14] Mother's claim raises a question of law. We review questions of law de novo. (See *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1499.)

In her reply brief, mother supports her claim by contending that it "appears clear that subdivision (b)(14) of section 361.5 is applicable to the instant case." That provision provides that the trial court need not provide reunification services when the court finds:

> "(14) That the parent or guardian of the child has advised the court that he or she is not interested in receiving family maintenance or

---

[13]   The statutory section authorizing the denial of reunification services are commonly referred to as "bypass provisions." (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.)

[14]   Specifically, mother contends, "Where a court is presented with what appears to be the purported relinquishment of a valuable right (as occurred here when counsel conceded the bypass), a court should [e]nsure that right is being relinquished freely and voluntarily, which necessarily requires that the court conduct a colloquy with the parent in open court to determine whether the parent understands the right is being relinquished and freely and voluntarily relinquishes that right."

15

family reunification services or having the child returned to or placed in his or her custody and does not wish to receive family maintenance or reunification services.

"The parent or guardian shall be represented by counsel and shall execute a waiver of services form to be adopted by the Judicial Council. The court shall advise the parent or guardian of any right to services and of the possible consequences of a waiver of services, including the termination of parental rights and placement of the child for adoption. The court shall not accept the waiver of services unless it states on the record its finding that the parent or guardian has knowingly and intelligently waived the right to services."

Section 361.5, subdivision (b)(14) has no applicability in this case because, contrary to her claim, mother did not have a "right to services." As noted, under section 361.5, subdivisions (b)(10) and (b)(11), the court may deny reunification services to a parent if the court has previously terminated reunification services or parental rights with respect to a sibling of the child and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ." Because mother's parental rights with respect to the siblings were previously terminated and mother did not make a "reasonable effort" under section 361.5, subdivisions (b)(10) and (b)(11),[15] these bypass exceptions to the provision of services applied to her. We reject mother's claim that the trial court was required to conduct a colloquy to determine whether mother knowingly and intelligently waived her purported "right to *reunification services*," since mother had no such right to waive. (Italics added.)

---

[15] We discuss this issue further in part III.D., *post*, in analyzing mother's ineffective assistance of counsel claim.

16

To the extent that mother contends that the trial court was required to conduct a colloquy to determine whether mother wished to waive her right *to a hearing* on whether the exceptions contained in sections 361.5, subdivisions (b)(10) and (b)(11) applied, we reject this argument, as well. In support of this contention, mother notes that in *In re Monique T.* (1992) 2 Cal.App.4th 1372, 1377 (*Monique T.*), the court concluded that a trial court must advise a parent of various due process rights attendant to a jurisdictional hearing in a dependency matter and obtain a waiver of those rights before accepting a waiver. However, *Monique T.* is premised on specific requirements contained in the California Rules of Court pertaining to jurisdiction hearings in dependency cases. (See *Monique T.*, *supra*, at pp. 1375-1376 [discussing Cal. Rules of Court, [former] rules 1412(i), 1449(b)].) Mother points to no such rule that requires an analogous admonishment and waiver procedure before a parent submits on an Agency's recommendation to deny reunification services.

On the contrary, in *In re Joshua G.* (2005) 129 Cal.App.4th 189 (*Joshua G.*), this court rejected the parents' contention that the juvenile court erred in not advising the parents of the consequences of waiving their rights to a hearing on the merits when they "submitted at the [section 366.26] referral hearing." (*Id.* at p. 200.) The court in *Joshua G.* explained:

> "Although they have provided us with several cases that discuss knowing and voluntary waiver of constitutional rights in criminal proceedings, none of those cases addressed the issue in the context of dependency matters. The parents have cited no authority requiring the court to determine whether a parent's choice to submit at a referral hearing is knowing and voluntary. [Fn. omitted.] To the contrary, the court has a duty to explain the parents' rights to a

17

hearing only at the jurisdictional hearing.  (Cal. Rules of Court, [former] rules 1412(j), 1449(b).)"  (*Ibid.*)

We agree with the *Joshua G.* court and are aware of no authority that would require the advisement and waiver colloquy that mother contends should have occurred in this case.

Accordingly, we conclude that the trial court did not err in failing to determine whether the mother knowingly and intelligently elected not to contest the Agency's denial of services recommendation before denying mother reunification services.

D.      *Mother has not established that trial counsel provided ineffective assistance in electing not to contest the Agency's recommendation to deny services*

Mother claims that her trial counsel provided ineffective assistance in electing not to contest the Agency's recommendation to deny reunification services.[16]  Mother contends that this election constituted ineffective assistance because there "could have been no reason" for trial counsel not to contest the recommendation since opposing the recommendation would have been a "clear winner."

1.      *Governing law*

a.      *Relevant law governing ineffective assistance of counsel claims in dependency matters*

"[A] parent in a dependency proceeding has a right to effective assistance of counsel and a right to seek review of claims of incompetence."  (*In re Carrie M.* (2001)

---

[16]      As noted previously, we summarily deny by way of a separate order filed today mother's petition for habeas corpus in which she contended that trial counsel provided ineffective assistance.

18

90 Cal.App.4th 530, 535.)  Specifically, "a parent is entitled to due process representation by counsel at any hearing which results in a referral to a section 366.26 selection and implementation hearing, and can raise as an issue on an appropriate and timely petition for review the contention of prejudicial error resulting from ineffective assistance of counsel."  (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 239-240 (*Arturo A.*).)

"Where the ineffective assistance concept is applied in dependency proceedings the appellant must . . . [demonstrate] that 'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.'  [Citations.] Second, there must be a showing of prejudice, that is, 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "  (*In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711.)

" '[A]n ineffective assistance claim may be reviewed on direct appeal [only] where "there simply could be no satisfactory explanation" for trial counsel's action or inaction.' " (*In re Darlice C.* (2003) 105 Cal.App.4th 459, 463.)  For example, an appellate court may not presume that counsel's action in a dependency matter was "the result of negligence," where the record permits the inference that counsel's action may have been "based upon some practical or tactical decision governed by client guidance."  (*Arturo A.*, *supra*, 8 Cal.App.4th at p. 243.)

b.      *Relevant substantive law*

Section 361.5, subdivision (b) provides that a trial court need not provide reunification services to a parent in a dependency matter when the court finds:

"(10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian.

"(11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

In *R.T. v. Superior Court* (2012) 202 Cal.App.4th 908 (*R.T.*), the court interpreted the reasonable effort requirement in these two provisions as follows:

"The reasonable effort requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' (*Cheryl P. v. Superior Court* [(2006) 139 Cal.App.4th 87, 99 (*Cheryl P.*)].) 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted." ' [Citations.] However, '[t]he "reasonable effort to treat" standard "is not synonymous with 'cure.' " ' [Citation.]

"We do not read the 'reasonable effort' language in the bypass provisions to mean that *any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the *duration*, *extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made.

20

"Simply stated, although success alone is not the sole measure of reasonableness, the *measure* of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*Id.* at pp. 914-915.)

2.    *Application*

We consider first whether the record on appeal establishes that " ' "there simply could be no satisfactory explanation" ' " (*In re Darlice C.*, *supra*, 105 Cal.App.4th at p. 463), for mother's counsel not contesting the Agency's recommendation to deny reunification services. As noted previously, at the outset of the disposition hearing, mother's counsel informed the court that mother was "not contesting the recommendation at this time," explaining, "It's not because she doesn't want to have services, but she is deferring to her children's feelings and wishes at this time."

In light of these statements, it is clear that we must presume that counsel's failure to contest the Agency's recommendation to deny reunification services was attributable to "client guidance." (*Arturo A.*, *supra*, 8 Cal.App.4th at p. 243.) Further, at the disposition hearing, mother's counsel provided a plausible tactical basis for electing not to contest the Agency's recommendation to deny reunification services, stating:

> "I would just point out on behalf of my client that, unlike the father, she does recognize these children do have valid reasons for not wanting to visit.[17] She's extremely hopeful they will want to. She's going to continue in services on her own. She's recognizing the problem. But aside from all the legalities, this is a family issue. And at this point, it's her belief that the boys' feelings should be accorded some deference. Not that the children should control

---

17     At the time of the disposition hearing in December 2014, E.S. and V.S. were refusing all visitation with mother.

everything, but I think that she's making a very child centered decision and not fighting now."

In sum, by electing not to contest the Agency's recommendation to deny her reunification services, mother was able to argue to the court that she was putting the children's needs above her own. The reasonableness of pursuing such a tactical strategy is strengthened by the fact that at the time of the disposition hearing, there was very little, if any, evidence tending to suggest that reunification might be feasible. For example, there was evidence that mother continued to live with the children's father and that father was refusing to address his serious substance abuse problem that rendered him incapable of providing care for the children. Further, there was no evidence that mother had begun to attend a substance abuse program dedicated to addressing her addiction to methamphetamine.[18]

We also reject mother's contention on appeal that, had she opposed the denial of reunification services, this opposition would have been a "clear winner." Mother argues, "Based on uncontested facts in the record, mother had in fact addressed and treated her problems (the problems that led to the removal and termination of services and rights as to her other children) by virtue of her active case for [E.S.] and [V.S.] between 2006 and 2008, during which time she did services and regained custody of [E.S.] and [V.S.] and the case was closed." To the extent that mother intends to argue that the fact that she previously reunified with E.S. and V.S. necessarily establishes that she had made

---

[18]     The record contains evidence that mother admitted to a social worker having a "drug addiction dating back to 1993."

22

"reasonable efforts" under section 361.5, subdivisions (b)(10) and (b)(11), we reject such argument. (See *R.T.*, *supra*, 202 Cal.App.4th at pp. 914-915 [concluding trial court did not err in bypassing reunification services pursuant to section 361.5, subdivisions (b)(10) and (b)(11) notwithstanding prior successful reunification with child].)

Mother also contends that "[t]here was *no* evidence to support the bypass," and that evidence that she had "relapsed on drugs and did not handle father's drinking in 2014," was "*irrelevant* to the bypass issue." (Italics added.) On the contrary, evidence that mother was again struggling with the same issues that had led to the termination of mother's parental rights as to E.S. and V.S.'s siblings in 2005, had resulted in E.S. and V.S.'s removal in 2006, and had not been resolved throughout 2014 during the period in which the Agency provided voluntary services, was clearly relevant in assessing whether mother had made reasonable efforts to deal with the problems that led to the removal of E.S. and V.S.'s siblings. (See *R.T.*, *supra*, 202 Cal.App.4th at pp. 914-915.)

While mother is correct that there are courts that have emphasized that evidence of tangible progress is not necessarily required to establish "reasonable efforts" (see, e.g., *In re Albert T.* (2006) 144 Cal.App.4th 207, 221; *Cheryl P.*, *supra*, 139 Cal.App.4th at p. 99; *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464), we do not read such cases as stating that evidence that a parent is again engaging in neglectful behavior is irrelevant with respect to whether the parent is making only lackadaisical or half-hearted efforts to eliminate such behavior. Rather, like the court in *R.T.*, we view *Cheryl P.* and similar cases as merely stating that a parent's progress in eliminating neglectful behavior is not to be the "sole measure" (*R.T.*, *supra*, 202 Cal.App.4th at p. 915) in assessing the

23

reasonableness of a parent's efforts to treat the problems that led to removal of a child's sibling in determining whether to deny reunification services.

Accordingly, we conclude that mother has not established that trial counsel provided ineffective assistance in electing not to contest the Agency's recommendation to deny reunification services.

E.     *There is substantial evidence to support the trial court's finding that the beneficial parent-child relationship exception did not apply*

Mother claims that the trial court erred in finding that the beneficial parent-child relationship exception did not apply to preclude the termination of mother's parental rights.

1.     *Governing law and standard of review*

If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception to adoption.  (§ 366.26, subd. (c)(1).)  An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  "A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

With respect to the visitation prong, "[r]egular visitation exists where the parents visit consistently and to the extent permitted by court orders."  (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  The lack of regular visitation "fatally undermine[s] any attempt to find the beneficial parental relationship exception."  (*Ibid.*)

24

This court has interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

We review a trial court's finding as to whether "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)), for substantial evidence. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) Under this standard, "[u]nless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Ibid.*)

2. *Application*

We first consider evidence related to the visitation prong. The Agency's April 14, 2015 section 366.26 report indicated that the parents had "limited contact with the children during this dependency case due to the children choosing not to participate in visitation." The report indicated that the mother had three visits with V.S., and two visits with E.S., between January and March 2015. A May 18, 2015 addendum report indicated

25

that the children were visiting with their mother once every other week. Even assuming that mother satisfied the regular visitation prong based on such visitation, there is more than ample evidence to support a finding that mother's relationship with E.S. and V.S. was not so beneficial so as to outweigh the advantage that the children would gain through adoption.

The Agency's section December 11, 2014 addendum report noted that the parents had "a long pattern of substance abuse and neglect," and that the parents had "failed to demonstrate any progress in obtaining or maintaining sobriety," during the preceding six months, despite having been offered voluntary services.

The December 11 addendum report also indicated that E.S. and V.S. "are very emotional and that they cry" when it's time to attend visitation with their parents. According to the report, both children stated that "they [were] not ready to see their mother and father." The same report indicated that the children's therapist reported that the children were much happier since being removed from their parents' home and moving in with their grandparents. The therapist indicated that she was concerned about the emotional effect that visitation was having on the children and recommended that visitation take place only in a therapeutic setting.

In a December 3, 2014 letter attached to the Agency's addendum report, the children's therapist reported that the children had "painful and stressful memories of their parents fighting with each other almost every day." The therapist indicated that E.S. and V.S. reported that they would "try to hide away in their room" when their parents fought.

26

In contrast, the children told the therapist that they "felt peace at the grandparent[s'] home . . . ."

The April 14, 2015 section 366.26 report summarized the family's history, noting the parents' history of substance abuse and neglect and their "ongoing denial and minimization of the impact of their substance abuse on their children."

The same report indicated that E.S. had soiled himself during a visit with mother on February 16, 2015. The children's therapist informed an Agency social worker that some children engage in such behavior "as a way of having control and/or being passive aggressive . . . ." On March 10, the children's therapist reported that E.S. did not want to visit with his mother and recommended that no visitation occur for the time being. The therapist also stated that he did not want to continue discussing with E.S. whether he wanted to visit with his mother because these discussions caused E.S. to experience stress. On March 17, V.S.'s caregiver reported that when she asked V.S. whether he wanted to visit with mother, he responded, "Yeah [okay], but not all the time. Once in a while is fine with me."

The section 366.26 report also indicated that the children had been living with their maternal grandparents since October 23, 2014. According to the report, the children "appear[ed] to be comfortable" in the home, and the grandparents had "proven their ability to meet the children's needs . . . ." The grandparents had previously adopted three siblings of E.S. and V.S. and had indicated that they were willing to adopt E.S. and V.S., as well. In addition, E.S. and V.S. wanted to be adopted by the grandparents and indicated that they were "looking forward to a stable and permanent home."

27

A Court Appointed Special Advocate's (CASA) report outlined the family's lengthy history with social services agencies, noting that eight prior referrals had been made involving allegations of general neglect and emotional abuse. The CASA reported that two of the allegations were unsubstantiated, two were inconclusive and four were found to be substantiated. The CASA's report also recommended that both parents' parental rights be terminated, reasoning:

> "[E.S.] and [V.S.] appear to be happy and thriving in their caregiver's home. They live with their three older siblings, who were adopted by the caregivers, and they have a great relationship with everyone in the home. The caregivers provide a caring, safe and nurturing environment and are willing to adopt E.S. and V.S. Both boys have expressed their clear and ongoing desire to continue living with their caregivers. Mr. and M[r]s. [S.] have struggled with alcohol and drugs and the boys often refuse to visit with them. I believe that the boys need a stable, secure home, which is what the caregivers provide, and that adoption would be in their best interest. I recommend that Mr. and Mrs. [S.'s] parental rights be terminated and that adoption be identified as the permanent plan."[19]

In a May 18, 2015 addendum report, the Agency commented that the children's therapist noted that E.S. continued to smell, as if he had defecated on himself during visits with his mother. The Agency noted that E.S. had informed an Agency social worker that he did not want to visit mother's home. When asked why, E.S. responded, "She just wants to show us that our dad isn't there, but she always says he (father) isn't

---

[19]     At the section 366.26 hearing, counsel for E.S. and V.S. also urged the court to follow the Agency's recommendation and terminate parental rights, and argued that the relationship between the children and their mother was not of the type contemplated by the Legislature in adopting the parent-child beneficial relationship exception.

going to be there, but he always comes back."  V.S. said, "Yeah," and nodded his head in an agreement.

In light of this evidence, the trial court could reasonably find that the children had suffered a long history of neglect with their mother, were reluctant to see her, exhibited signs of distrust toward her, and were thriving in the home of relative caregivers who had expressed a willingness to adopt the children and had already adopted the children's siblings.  Thus, there is clearly substantial evidence to support a finding that any benefit from continuing the parent-child relationship would not promote the well-being of E.S. and V.S. to such a degree as to outweigh the well-being the children would gain in a permanent home with new, adoptive parents.

Mother's arguments to the contrary are not persuasive.  Mother points out that the section 366.26 report stated that the children indicated they were upset that their father had abused their mother.  According to mother, this evidence "demonstrates, by virtue of their concern for her, that there is a bonded relationship with her."  We disagree.  The fact that the children had experienced trauma related to witnessing domestic violence in the home does not constitute "undisputed facts establish[ing] the existence of a beneficial parental . . . relationship . . . . "  (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) Mother also notes that she testified at the section 366.26 hearing that E.S. and V.S. had told her during visits that they wanted to return to her custody.  Even assuming that this testimony was credible, there was considerable evidence that the children had made it clear that they wanted to be adopted by the grandparents.  In addition, there was evidence that E.S. had told his mother that he wanted to visit her at her home, but that he later told

29

his caregiver that he did not want to attend such a visit. E.S. explained to the caregiver that he had expressed an interest in visiting his mother because "he felt bad saying no."

Mother also contends that her case is analogous to *In re Amber M.* (2002) 103 Cal.App.4th 681, 684 (*Amber M.*) in which this court reversed a judgment terminating parental rights based on the parent-child beneficial relationship exception. Mother notes that, like the mother in *Amber M.*, during her visits with her children she was attentive and supportive. (*Id.* at p. 690.) In addition, mother notes that her children were older than the children at issue in *Amber M.*, and that they had only recently been removed from her care, while the children in *Amber M.* had spent a great amount of time out of the mother's custody. We are not persuaded. In summarizing the evidence of the parent-child relationship in *Amber M.*, this court stated, "The common theme running through the evidence from the bonding study psychologist, the therapists, and the CASA is a beneficial parental relationship that clearly outweighs the benefit of adoption." (*Ibid.*) In contrast, in this case, there was no bonding psychological study, the children's therapists recommended that the mother's visitation be limited, and minor's counsel and the CASA both argued against the applicability of the beneficial relationship exception. In sum, the evidence of the relationship between the mother and children in *Amber M.* was far different from the evidence of the relationship between mother and E.S. and V.S. contained in the record in this case.

Accordingly, we conclude that there is substantial evidence to support the trial court's finding that the beneficial parent-child relationship exception did not apply.

30

IV.

DISPOSITION

The order denying reunification services and the judgment terminating parental rights are affirmed.


AARON, J.

WE CONCUR:

McDONALD, Acting P. J.

IRION, J.

31